# Greenlee *versus* Greenlee.

1. To make title to land under a parol contract, there must be clear and explicit proof of the contract and of its terms and conditions—that it was fair and conscionable, executory, and founded in sufficient consideration; and so far executed that it would be a fraud on the vendee or his heirs not to execute it.

2. Such a contract must be *express* and not implied from the acts of the parties, and both sides of it must be shown by the party who alleges its existence.

3. The uncorroborated testimony of a single witness, denied on the part of the adverse party, is not sufficient evidence of a parol contract for the purchase of lands.

4. Where the evidence at most made out an implied promise to convey the title on terms which were not disclosed, the performance of which therefore was not to be ascertained, it was error to submit the case to the jury.

5. The possession, necessary to take a parol contract for the purchase of land out of the statute, must be exclusive in the vendee, and must be taken and maintained under and in pursuance of the contract. Therefore a tenant in possession cannot be a purchaser by parol without a formal surrender of his possession under the lease and a resumption of it under the contract of purchase.

6. An ejectment by the holder of the legal title is to be regarded in the light of a bill in equity, and may be defended against by proof of a contract which might be *insufficient* to justify a decree of specific performance.

ERROR to the Common Pleas of *Crawford county*.

This was an ejectment by Robert Greenlee against Rebecca Greenlee, for 75 acres of land in Crawford county.

The plaintiff claimed the legal title under a conveyance from E. Huidekoper in 1849, in pursuance of a contract made in May, 1842.

The defendant, Rebecca Greenlee, widow of Michael Greenlee, deceased, claimed to retain the possession under an alleged parol contract made by her husband with his father, the said Robert Greenlee. The defendant had two children, who were minors, for whom the title was claimed.

The defendant was married in 1847, and in the winter of 1847-8, her husband and herself moved upon the land. He cultivated a portion of it, built a barn, dug a well, made some fence, put out some fruit trees, &c., till 1849, when *he* leased the farm for one year for $45 and the taxes. The lessees continued in possession until the fall of 1850, when Michael, the son, died at his father's. The taxes, during the time it was occupied by him and his tenants, were paid by Michael—they were assessed in his name. There was no contract for the land proved to have been made between the father and son before the latter took possession. The statement submitted on part of the plaintiff in error, defendant below, was in substance as follows:

The plaintiff and a man named Oveit contracted for the land with the Huidekopers, in May, 1842. Oveit afterwards transferred his interest to his co-purchaser, who, in 1849, obtained a deed from the owners of the legal title.

The defendant claimed under an alleged parol sale of the land by the plaintiff to his son Michael, the deceased husband of the defendant—but without any evidence showing when it was made, or the terms thereof, or how the son took possession. Declarations of the plaintiff during the lifetime of the son, and acts and declarations after the decease of the son, were relied upon as evidence of a contract. A few acres of the land had been cleared, and a house erected by *Oveit*, while he had an interest in it. The defendant proved, by her father, D. A. Conover, her marriage in the fall of 1847, when, or soon after, she and her husband moved on the land; that he occupied and worked it; built a barn, dug a

[Greenlee *v.* Greenlee.]

well, improved some, made some fence, set out some fruit trees, and built a hog-pen, remaining until 1849, when the deceased rented the farm to the witness and another for $45 and the taxes for a year. The lessees continued in possession till the fall of 1850, when Michael, the son, died at his father's. The witness stated that, during the son's sickness and shortly before his death, he went to have a settlement with him about the rent, when he asked the plaintiff what *he* had to say about it, who replied that it either was Michael's or it was his business, and not his; and it was adjusted between the father and son-in-law. That in September, 1848, the father told the witness that Michael had been a good boy and paid him for the land—that no deed had been yet *got out* for it; but that he would get one in his (the son's) name, —that a report had been put in circulation that he would not do so, but it was false; that it was a good thing Michael had no deed, as he was in the Baldwin Mill Co., and if it broke down, his creditors could not take the land:—That in September, 1850, he was in conversation with Michael's parents about his support, when the father said the farm would keep him if he could not work—and that a few days before his death the deceased requested the witness to sell his land and settle his accounts, which he promised he would do. (The deceased had fifty acres by contract from the witness.) The witness further stated that, in the month following Michael's death, he with others, at the widow's request, called on the plaintiff to talk about his concerns—that she wanted no will or gifted property, but her husband's, to administer upon and pay his debts; that plaintiff replied he owed Michael nothing, but that he owed him. Witness asked him if Michael had not paid him $80 on the land; he said he had paid him $75, to which the other replied that that would make it *real estate.* That plaintiff said he had made a settlement or agreement with Michael before his death that he would pay his widow $500, which the son thought it would be better to take than keep the land. That witness asked him if he would not take the fifty acres he had sold Michael, and pay what was owing *him* for it, and all the debts, which he thought would be four or five hundred dollars; to which the plaintiff said he would make a proposal,—to pay the widow $500 in ten yearly instalments, with interest, pay the witness's demand, about $50, and all the debts of the estate. That the plaintiff's wife then came into the room and said she was displeased when Michael bought the fifty acres, as he had enough of his own before. That on the same or next day a bond for the $500 was drawn, which the plaintiff declined signing on account of the interest which it called for. A few days after, the parties again met: and the plaintiff said that, as he supposed the witness had full authority to settle the estate as executor (though there was no will, nor had letters

[Greenlee *v.* Greenlee.]

of administration been granted to any one), he would agree to pay the widow $100 in two years, the witness's claim, with interest, and all the debts. The scrivener asked what consideration he should mention in the writing for the premises, when plaintiff said the claim which Michael had in the Oveit farm,—and two notes were then drawn and signed by the plaintiff—also the agreement of plaintiff with Conover as executor of Michael, by which the former, "in consideration of a claim the said Michael had on the farm," agreed to pay the widow $100, all the debts, and Conover his claim; but the $500 bond was not signed. That some time after the plaintiff came to the witness with a citation to have the defendant take out letters of administration, and saying that what they had done would amount to nothing, that it was not done according to law; and that witness replied he would have nothing more to do with it. That in April, 1851, the plaintiff called on the witness and agreed to pay the writings as he gave them; that the latter said they were in Meadville, and that they agreed to go there and bring the matter before the Court. That at different times afterwards witness asked plaintiff if he would settle as he had agreed, when he said not; that the land belonged to him, and that it was *a gift* or willed property to his son—that witness had no right to it,—that *he* did not owe Michael anything, and that the widow must go off. The witness testified—under an exception by the plaintiff—in answer to a question by the defendant, how Michael was in possession when he claimed the land,—that Michael said, while on the land, that he was there under his father by purchase.

On his cross-examination, the witness made answer to various questions (in which, it was stated that he was more or less contradicted by other witnesses), and said that he knew of no contract between the plaintiff and his son,—that he saw John, another son of the plaintiff's, working on the barn in framing, and that the plaintiff may have built it.

A. Shelden testified that he was present at the first conversation between the former witness and plaintiff after the death of Michael, and the effort at a compromise—and said that they talked about the debts and other fifty acres, and that he understood the plaintiff said he would pay the debts and give the widow $500, but it was not said for what—and that all the property Michael had was in the fifty acres bought of Conover.

Isaac Baldwin testified that *Oveit* made most of the improvements on the land, that Michael was on it and said he owned it; and that he resided there about a year when he rented it to Conover and Graham. He testified to the conversation between plaintiff and Conover, after Michael's death, when a settlement was proposed—that *he* drew the writings—asked what consideration

[Greenlee v. Greenlee.]

he should put in for the premises to pay—if it should be the claim which Michael had in the Oveit farm—to which the plaintiff replied, yes.

T. Conover said that two weeks before Michael's death, she heard the plaintiff say, at his own house, that his, Michael's farm, would support him if he never did a day's work. After his death the *defendant* told plaintiff one day that Michael had told her that he, the plaintiff, would give him a deed for the land; that the plaintiff replied, if he had given him one it would have done her no good, as the creditors would have sold it. She then told him that Michael had said, when he heard that his father had stated that he would take the deed in his own name, that he would leave it at once; to which plaintiff made reply as before: that she heard plaintiff say he should have taken the deed in Michael's name had it not been for the debts he owed.

H. Graham testified that he went with Conover to the plaintiff to settle with Michael for the rent; Conover asked plaintiff what he had to say about it, he replied nothing, it was none of his business. That he had often heard Michael say the farm was his.

Geo. W. Conover testified that he heard Michael say the land was his by purchase from his father, and that he was to pay for it; that he heard plaintiff ask defendant if he paid up the claim whether she would not throw off the $100, to which she replied that she could not, as it belonged to the heirs.

The defendant gave in evidence the assessment of the land to her husband for the years 1848–9 and 1850, and proved by A. Knapp that in 1850 he was assessor and called on the plaintiff, who did not give in the 75 acres; and he called on Michael, who gave in 125 acres.

She also proved by other witnesses that Michael said the land was his; that he expected it would be his; and that he had made improvements, as detailed in the first testimony by Conover; and read in evidence, under exception by the plaintiff, the Conneautville Courier, of Jan. 1, 1851, containing a caution by plaintiff to persons against taking the notes he had given to Conover and defendant—and a letter from the counsel of the plaintiff to Conover, advising him to give up the papers, as the settlement between the parties was, in his opinion, without authority; also the second note of plaintiff to Conover and defendant, the draft of the agreement drawn by I. Baldwin, Nov. 22, 1850, the unsigned bond of Nov. 22, 1850, and the citation of Nov. 22, 1850, from the register to the defendant.

The *plaintiff* then proved by E. Greenlee, that in 1849 he was selling Michael some cattle on credit, when he asked him if he had a deed for the Oveit lot, and he said that he had not, and that he did not own it. That the day before his death, Michael told him

U

[Greenlee *v.* Greenlee.]

that he had requested Conover to settle his estate and sell the land he had bought of him, and that in reply to a question asked him, whether he owned *the Oveit lot,* he said that he did not, but supposed Rebecca would live on it.    The witness also testified to the plaintiff letting Michael have money at different times.

John Greenlee testified that the barn was built in company, by himself, his father, and Michael; that many of the materials therefor were got and paid for by the father, and that the work was done for him; that *he* hauled a greater share of the rails used in fencing, helped to split and lay them up, and that the father's team aided in hauling the stone for the wall; that his father had the management of the farm, and stock on it, and a piece of buckwheat in it the first year Michael moved on; and that Michael attended to foddering the cattle; that Michael asked his advice about buying Conover's land, and he told him not to purchase it, as his health was poor and he could not pay for it, to which Michael replied: "John, you know the other land is not mine, and father may give it to me or not, as he pleases;" and that he wanted a piece he could call his own, and thought he could buy; and that after he did buy, he consulted his father about renting the 75 acres, and apply the rent towards the 50 acres, on which he could keep a dairy; and that his father consented that he might.

Thomas Tenure testified that Michael told him that he did not claim the land as his own, but supposed his father would give it, or the Doran place, to him one time or another; he said he did not know if he should have the Oveit farm; that his father told him he might go and work it, and have what he could make.    Witness said that *plaintiff* had 10 or 15 head of cattle on the land in May or June, after Michael went on.

Patrick Tenure testified that the plaintiff's stock was on the land till the fall after Michael went there, and that the plaintiff and Michael worked there.

George Head, E. Greenlee, and W. Baldwin testified to the plaintiff's having his cattle on the land after Michael took possession.

There was other testimony, not material to be here noticed.

The plaintiff's counsel submitted the following points:—

1. That to make a good contract by parol for the sale and purchase of land, the purchaser must show what the contract was; when it was made, the consideration to be paid, the quantity of land, that exclusive possession was taken under and in pursuance of the contract, and that the purchase-money was paid or valuable improvements made to an extent which would render it unjust to turn him out of possession—and all this must be clearly and unequivocally proven.

2. That there being no evidence here, such as the law requires,

[Greenlee *v.* Greenlee.]

of any contract between the plaintiff and his son, showing when a contract was made, how much was to be given for it, or what was paid, or that he ever went into and took exclusive possession of the land, the plaintiff is entitled to recover.

3. That if even the plaintiff said to his son, or any one else, after his decease, that he would give or pay $500, more or less, to the widow and children, it would of itself form no evidence of a contract, such as would take the case out of the statute of frauds and perjuries.

4. That to entitle the defendant to hold the land under a resulting trust, it is necessary she should have shown by clear and unequivocal evidence, that it was purchased by the plaintiff with the money of his son.

5. That the evidence here is not of such a character as would justify the Orphans' Court, on a petition and proof for a specific performance, *in decreeing such performance.*

On part of the defendant the following points were submitted:

1. That possession, assessment, and payment of taxes and payment of purchase-money are evidence of a contract, and if the jury believe from the evidence that Michael Greenlee took and held exclusive possession of the premises in dispute from 1847 until his death in 1850, and paid a consideration for the same, and paid the taxes thereon, and claimed it as his own, and plaintiff knew all the facts and received a consideration for the land, it is sufficient evidence of a parol contract of sale not within the statute of frauds and perjuries, and plaintiff is not entitled to recover.

2. That if the jury believe from the evidence that Michael Greenlee went on the premises in dispute in pursuance of an agreement with his father, put on improvements and paid the purchase-money, and in pursuance of a private arrangement between him and his father, the father took a deed in his own name to prevent the creditors of Michael from reaching the land for Michael's debts, it would create in the father a resulting trust for the benefit of the widow and heirs and creditors of Michael, and plaintiff is not entitled to recover.

GALBRAITH, J., charged, *inter alia,* as follows:—

"It seems that at the time of the alleged sale or agreement, the plaintiff had contracted by article of agreement with the Huidekopers for the purchase of the land in 1842, for $550, and had paid part of the purchase-money. Conover tells you that in 1847 the plaintiff told him that his son, then the husband of the defendant, had been a good boy, that he had bought the land from him and paid him up—that he (the plaintiff) had not got a deed yet from the office, as he had not himself paid all the money for it, and when he did so, and took out the deed, he would take it in Michael's name. If the facts were true as stated by plaintiff, if

[Greenlee *v.* Greenlee.]

rightly understood and truly testified by Conover, it would be pretty conclusive evidence of such a contract as would take the case out of the statute, if accompanied by the other requisites. It is in evidence also that he afterwards stated, that it was a good thing that the deed had not been made to Michael because he was engaged in the Baldwin Mill Company, and if it would break down Michael could not sell the land. There was evidence also that plaintiff stated that Michael had paid him part on the land and still owed him more on it. Does this, together with his statements in 1850, in relation to the rent of the farm coming from Conover and Graham, that it was Michael's business and not his, and the settlement and payment of the rent to Michael under this statement, when applied to by the tenant—his acknowledgment of his agreement with Michael on his death-bed to pay the widow a sum of money, with debts, &c., for Michael's interest in the land—the negotiations afterwards by way of settlement, satisfy you of the existence of the contract, sale and payment, as alleged by the defendant—was the possession delivered to Michael in pursuance of the contract, if such contract has been shown. It is testified he moved into the old house in the winter of 1847-8; was this in pursuance of the alleged contract? This is a necessary and essential ingredient in the title—for although, as I apprehend, a man might even sell to one in possession as his tenant, yet if the sale was clearly proved, a possession might be delivered anew in pursuance of the contract of sale. Does the evidence in this case clearly satisfy you of such delivery of possession in pursuance of the contract of sale? If the testimony of Conover and Graham satisfy you that in 1850 the plaintiff recognised Michael as the landlord of the land, as the owner, it is a strong circumstance in proof of his possession being in pursuance of the contract, provided you are satisfied of the existence of such contract, sale, and payment of purchase-money. This possession must also be *exclusive;* that is, it must be such as to leave no legal right in the vendor to enter on the premises or part of them. Had Michael then such a contract, such an exclusive possession delivered in pursuance of it, and had he the legal control and management of the farm by virtue of such contract and possession? If he had, the circumstance of the father coming there occasionally or even grazing cattle on the farm, would not destroy such exclusive possession.

"In answer to plaintiff's 1st and 2d points, it is replied that they are correct as general propositions; and also the 3d, with this explanation, that although the agreement to pay $500, or saying he would do so, would be of no importance of itself; it might seem as corroboration of other facts and circumstances given in evidence to make out the defence set up by the defendant.

"To the 4th point we do not entirely assent, although generally

[Greenlee *v.* Greenlee.]

true. If the plaintiff entered into a contract for the purchase of the land from the Huidekopers, and then received the purchase-money from his son, or any other price agreed upon, under contract with the son to have the deed made in his name, and delivered possession to him in pursuance of the contract, and improvements were made, &c., he would be a trustee for the benefit of Michael and his representatives, and it would constitute such an equity in the defendant's intestate as to defeat the plaintiff's recovery, although the original purchase may not have been with Michael's money.

"The court declines answering the plaintiff's 5th point. It is an abstract question hypothetically put, which, even answered in the affirmative, might not be conclusive against the defence in this case. It is the province of the jury to decide upon the facts on which the defence here rests; and were the defendant here as the representative of Michael with his bill for specific performance in a court of equity, the facts might be so far involved in complication and doubt as to require the reference of them to a jury, and still his equity might be a good and available one. Again: the plaintiff's writ is regarded in the light of a bill in equity, and what might amount to a sufficient defence to it, might not be sufficient to demand a specific performance on the other side."

Error was assigned, *inter alia*, as follows:—

3. The affirmative answers to the *defendant's* points were erroneous in point of law, and left the jury to infer from the language of the points, that the evidence and facts of the case were in accordance with what was stated in them; when such was not the case, there being no evidence of a contract *a priori*.

4. The Court erred in leaving it to the jury to find whether a contract existed between the father and son; and in saying "that if the fact were true as stated by plaintiff, if rightly understood and truly testified to by Conover, it would be pretty conclusive evidence of such contract as would take the case out of the statute, if accompanied by the other requisites;" when Conover said he knew of no contract, and his own and the evidence of others was of but a corroborative character.

5. In leaving the jury to find a contract, without such evidence as the law requires to constitute one, and which the court should, in a clear and distinct manner, have pointed out to them.

6. In charging that "a man might even sell to one in possession as his tenant, yet if the sale was clearly proved a possession might be delivered anew in pursuance of the contract of sale."

7. By saying that the exclusive possession "must be such as to leave no legal right in the vendor to enter on the premises," without discriminating between a present possession, such as the evidence showed that the plaintiff had and continued for months after

the son entered, and a right in the vendor to enter after an exclusive possession by the vendee.

8. In charging the jury, the Court brought before it all the prominent facts in evidence by the defendant, but wholly omitted those of the plaintiff—this would serve to mislead the jury.

9. The Court erred, too, in answering the plaintiff's 1st, 2d, and 3d points; instead of which the jury should have been told that proof of a contract, *a priori*, defining its character, should have been clearly made, and not be left to find one from evidence none other than corroborative.

10. In answering the plaintiff's 4th and 5th points there was also error.

*Derrickson*, with whom was *Richmond*, for plaintiff in error.— It was contended that there was no evidence of a contract or of any of the essential parts of one—the time, the price, and how and when the purchase-money was to be paid, or of the character of the possession by Michael Greenlee. That oral testimony should define with precision what the contract was, and fix the exclusive possession in the vendee, in pursuance of the contract. That this should be rigidly exacted in cases arising between parent and child, where affection often induces acts having the semblance, but not the essential ingredients of contracts: 7 *Barr* 104. As to what it was requisite for a vendee to show to take the case out of the statute of frauds, reference was made to 10 *Watts* 204, Woods *v.* Farmare; 2 *Barr* 315, Eshbach *v.* Zimmerman; 5 *Harris* 491, Gangwer *v.* Fry; 5 *W. & Ser.* 552, Baring *v.* Pierce; 2 *Jones* 173, Hugus *v.* Walker.

The suggestion by the Court, that a man might sell "to one in possession as his tenant, yet if the sale was clearly proved, a possession might be delivered anew in pursuance of the contract of sale," it was contended was at variance with the law as stated in Christy *v.* Barnhart, 2 *Harris* 264; Galbraith *v.* Galbraith, 5 *Watts* 144; and Brawdy *v.* Brawdy, 7 *Barr* 157.

It was said there was no resulting trust in the case, as when the plaintiff purchased he was to pay his own money, and the purchase was for himself: 9 *W. & Ser.* 62, Sample *v.* Coulson; 4 *Id.* 149, Jackman *v.* Ringland; 1 *Harris* 451, Tritt *v.* Crotzer.

*Finney*, for defendant.—The essential parts of a parol contract for land, are payment of purchase-money, possession, and the making of valuable improvements. Payment of purchase-money implies a contract, and exclusive possession under such contract establishes an equity, and valuable improvements made corroborate the evidence of the contract, and strengthen the equity. Payment of purchase-money was proved, possession and valuable improve-

[Greenlee v. Greenlee.]

ments; and, it was said, the failure to prove *the time* and *the price* will not invalidate the claim. Sufficient was proved to create a presumption of a contract, and the facts were for the jury. That such submission was proper in this case, reference was made to 10 *Watts* 107; 16 *Ser. & R.* 286; 9 *Id.* 169. As to the suggestion by the Court, that a man may sell to *his tenant*, reference was made to Aurand v. Wilt, 9 *Barr* 55.

The opinion of the Court was delivered by

WOODWARD, J.—It is conceded that the legal title to the land in controversy was in the plaintiff, but the defendant claimed that it belonged to her and her children, by virtue of a parol purchase made of the plaintiff by her husband, Michael Greenlee, in his lifetime, and that such equities had accrued from his payment of money, possession taken, and improvements made, as would induce a chancellor to decree specific performance of the contract, notwithstanding the statute of frauds and perjuries. The first thing necessary to such a defence was clear and explicit proof of the contract, of all its terms and conditions; for, before a chancellor would decree specific performance, which is of grace and not of right, he would require to be shown very clearly what the contract was— that it was fair and conscionable, executory, founded in sufficient consideration, and so far executed that it would be a fraud on the vendee or his heirs not to execute it fully. The party seeking specific performance must show affirmatively that he has been in no default, which cannot be explained and excused, and that he has taken all proper steps towards performance on his own part, for mutuality is of the essence of all contracts, and indispensable to move the conscience of a chancellor. A promise to convey is only one side of a contract, and, without the counterpart, is nude. What did the other party agree to do? Was he to pay money? How much, and when? To take possession, and maintain it, and make improvements under the contract? Then let him allege and prove these things. Let him show *both* sides of the contract, or else not expect a decree of specific performance.

The plaintiff asserted stoutly, and called on the Court to charge, that *no* contract had been proved in this case, but the Court, without professing to find evidence satisfactory to themselves, drew the attention of the jury to part of the evidence, and left them to infer a contract of sale.

If parol contracts are to be taken out of the statute of frauds and perjuries, they must be *express* and not *implied* contracts. If juries should be permitted to imply contracts of sale from the transactions which generally characterize dealings between father and son, paternal titles would be swept away in most of the cases where selfishness and avarice had not shut up the fountains of pa-

[Greenlee *v.* Greenlee.]

rental affection. But, happily for society, and families, and the better feelings of our nature, the law is not so.

In looking through this mass of evidence, the only direct proof of the contract alleged, that I am able to find, is in the testimony of Conover, the father of the defendant, who swears that the plaintiff told him Michael had bought the land, and paid for it, and that the report that he was not going to give Michael a deed, was false. This testimony is denied by the plaintiff point blank. Now, were the parties in Chancery, on bill and answer, specific performance could not be decreed on such evidence, for a chancellor invariably refuses, to decree on the uncorroborated testimony of a single witness, in opposition to even the defendant's interested answer on oath, though it cannot be read in evidence for him at the hearing: 7 *Barr* 159.

Conover's testimony is not only without corroboration, but is contradicted by those declarations of Michael, proved on the part of the plaintiff, which indicated an expectation that the place would ultimately be his, but which are decisive against the idea that he had bought and paid for it. The evidence also of the father's acts of ownership, such as pasturing and cropping part of the place, whilst Michael lived there, tended, not only to negative a sale, but to show that there was no exclusive possession in Michael. And so as to the negotiations between Conover and the plaintiff, after Michael's death; though they indicated that Michael had an interest in the land, for the extinguishment of which the father was willing to pay his debts, yet, as evidence of a contract of sale, they were worthless. For what was Michael's interest, and how much was to be paid for it, and how much had been paid, and when, and on what conditions was his father to convey the title? These are pertinent and obvious questions, which the evidence does not answer, and without full information on these points, there could be no decree. The admission of $75 paid, helps us to no suspicion even of how much remained unpaid. As was said in Soles *v.* Hickman, 8 *Harris* 180, a contract is as much void where the *consideration*, as where the *subject*, is undefined. We held in that case, on a full review of the authorities, that a *written receipt* for part of the purchase-money, defining the land sold, but not defining the price or any other terms of sale, did not take the case out of the statute.

Taking into view all the evidence before us, the utmost that can be claimed for it is an implied promise to convey the title on terms that are not disclosed, and therefore it is impossible to say whether they have been complied with or not. It was error to submit such a case to the jury.

These observations dispose of the 3d, 4th, 5th, 8th, and 9th assignments of error.

As the cause must go back, it is proper we should say we cannot

[Greenlee v. Greenlee.]

assent to the doctrine of the Court, as contained in the 6th and
7th assignments.  All the authorities show that possession, to take
a parol contract out of the statute, must be exclusive in the vendee,
and must be taken and maintained under, and in pursuance of, the
contract: Bassler v. Niesly, 2 Ser. & R. 355; Jones v. Peter-
man, 3 Ser. & R. 546; Eckert v. Eckert, 3 Pa. Rep. 332; Haslet
v. Haslet, 6 Watts 464; Allen's Estate, 1 W. & Ser. 383; Woods
v. Farmere, 10 Watts 204; Frye v. Shepler, 7 Barr 91; Moore v.
Small, 7 Barr 461.  It results necessarily from these cases that a
tenant in possession cannot be a purchaser by parol without a
formal surrender of his possession under the lease and a resump-
tion of it under the contract of purchase.

The 10th error relates to the answers given to the 4th and 5th
points of the plaintiff.  What was said in answer to the 4th point
was essentially correct, but we see no evidence on the record to
raise a resulting trust in Michael.  The answer to the 5th point
was proper enough.

The only two remaining errors, the 1st and 2d, relate to evi-
dence, but no bills appear to have been sealed, and therefore they
are not to be noticed.

The judgment is reversed and a *venire de novo* awarded.