## Piersol *versus* Neill.

1. As a general rule inconsistent remedies cannot exist at the same time either in tort or on contract.

2. An action of ejectment to enforce specific execution is governed by the same principles as a bill in equity.

3. If in such action, in the opinion of the judge, the facts would move a chancellor to decree specific execution, he should give a binding instruction to that effect.

4. The jury is not to administer the equities further than to find the facts.

5. Under the circumstances in this case the judge properly charged that the plaintiff had no equity.

November 19th 1869.    Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Beaver county* : Of October and November term 1869, No. 91.

The action was ejectment commenced July 22d 1867, by Samuel Piersol against Thomas Neill, Sr., for lot No. 157, in the borough of Freedom.

On the trial, March 24th 1869, before Acheson, P. J., the plaintiff called John Brown, who proved the articles hereafter mentioned ; plaintiff then gave in evidence.

" Article of agreement made this 30th day of March 1866, between Samuel Piersol, &c., of the first part, and Thomas Neill, of the village of Freedom, &c., of the second part, witnesseth, that the party of the first part sells his farm of one hundred and fifty acres, more or less, situated in New Sewickley township, county and state aforesaid, to the party of the second part, for the sum of $10,000, &c. Possession to be given on the 2d day of April next, free of all encumbrances. The several payments to be made as follows : $20 paid in hand, to close a bargain, the receipt of which is hereby acknowledged. And said Neill's property, in Freedom, to be received as a second payment of $3500, and a judgment note on the docket, in Beaver, of $2000 and upward, to be signed over by said Neill to said Piersol. The balance to be paid

annually, $1000 at least per year. Interest on the back payments to be at 6 per cent."

John Brown on his cross-examination, stated the facts and circumstances connected with the execution of the agreement. There was evidence also of tender of a deed by plaintiff and the refusal to accept by the defendant.

The defendant gave in evidence the record of an action of covenant by Piersol against Neill, commenced June 2d 1866, in which no declaration has been filed and no further proceedings had.

Other evidence was given by both parties, which is stated both in the charge of Judge Acheson, and in the opinion of C. J. Thompson, with such particularity as to give a full understanding of the facts of the case and the principles decided. Judge Acheson, after stating the stipulations of the agreement, charged :—

" On the next day, the 31st of March, the defendant gave the plaintiff notice that his wife was dissatisfied with the bargain, and that he would not fulfil it, and requested the plaintiff to return the $20 paid, which the plaintiff refused. Shortly after the 2d of April the plaintiff removed from the farm, and on the 16th of April he tendered a deed to the defendant, which the latter refused to accept.

" This ejectment suit is brought by the plaintiff to enforce the specific performance of the contract, by the recovery of the Freedom lots, which, by the terms of the article, were to constitute a part of the second payment.

" The defendant was procured to enter into the contract through the agency of Rev. John Brown. It appears that Brown had obtained government license, constituting him a real estate agent and conveyancer ; that Piersol desired to sell his farm for the sum of $10,000, and employed Brown as his agent, who undertook to find a purchaser—Piersol agreeing to pay him at the rate of *one per cent.* for his services. Brown induced Neill to buy the land, and to give in part payment therefor his Freedom property, valued at $3500. Neill was to pay him the same commissions. He was thus to receive $100 from Piersol, and $35 from Neill, for affecting the sale and exchange. Neill was an elder in Mr. Brown's church, and an aged man ; his wife was a feeble and sickly woman and their children had grown up, and with the exception of a daughter, had married and left them. Previous to the purchase, it was arranged between Brown and Neill, that the old man should go out to look at the plaintiff's farm. Accordingly, on the 30th of March, the defendant went to the land in company with Richard Beatty, who was living with him, and who has been examined as a witness. When they came to the farm, Piersol and Brown were together at the barn. Brown took the defendant over a part of the farm, the plaintiff remaining behind. It appears from the testimony that the defendant had not concluded to buy the land when

[Piersol *v.* Neill.]

he came there.   He was very reluctant to make the purchase; he objected to the quality of the land; to the bad condition of the fences, meadow, &c.; said that the price was to high; the land not worth half the money.   Brown urged him to buy, affirming that it was a cheap bargain; the best he could ever get; said he could cut wood enough off the farm to pay for it, that he could sell fifty acres off, and pay for it; told defendant to keep quiet and he, Brown, would fix it all up.   Enough is disclosed to show that the defendant reposed confidence in Brown, and was acting under his direction and influence.   On returning to the house, Brown drew up the article, and it was signed by the parties; at the same time he took their separate obligations for his commissions.   As soon as defendant's wife learned of the purchase, she was dissatisfied, and refused to have anything to do with it, and in consequence of his refusal, the defendant, the next morning, 31st of March, dispatched Richard Beatty with a written notice to plaintiff, informing him of his wife's dissatisfaction, and of his purpose not to comply with the contract.   Following this you have the effort of Brown to satisfy the defendant, and hold him to the bargain, by a calculation of defendant's means made on the back of the copy of the article.   The 1st of April came on Sunday, and Monday, the 2d, had been assigned for the exchange of properties, and passing deeds, but in consequence of the defendant's refusal, nothing was done at that time towards carrying the contract into effect.

"The plaintiff shortly afterwards removed from the farm, and we would say here, that as this was done with a full knowledge on his part of the defendant's refusal to fulfil the contract, the plaintiff's claim to enforce specific performance can derive no additional strength from his voluntary abandonment of the land. This is not the case of a contract partly executed where the plaintiff has been put to inconvenience and expense from the defendant's delay to make known his intention not to stand by the bargain.

"On the 16th of April 1866, the plaintiff tendered a deed to the defendant; nothing could be urged against the want of strict performance on the plaintiff's part as to time in making the tender, inasmuch as the defendant had given notice of his intention not to comply with the contract.   John Brown accompanied the plaintiff, and was present as a witness to the tender.   It appears from the evidence that Mrs. Neill was still dissatisfied, and refused to join in a deed with her husband, and that this was made known to the plaintiff at the time.   The defendant charged Brown with getting him into the trouble, and offered to pay $100 if the plaintiff would relieve him from the contract.

"The defendant having refused to accept the deed, the plaintiff brought an action of covenant against him, June 5th 1866, which

[Piersol v. Neill.]

is still pending and undetermined in this court. In the winter following Mrs. Neill died, and after her death, on the 8th of March 1867, the plaintiff brought the present ejectment suit.

"The defendant resists a recovery by the plaintiff on two grounds. First, he contends that the plaintiff by resorting to his action of covenant elected his remedy in damages, and cannot now maintain ejectment for specific performance; and, second, that under the evidence specific performance ought not to be decreed, but the plaintiff should be left to his remedy at law.

"As to the first ground of defence, it is claimed that the remedies employed by the plaintiff are inconsistent; that the plaintiff having brought his action of covenant as an instrument of rescission, cannot maintain ejectment for specific performance."

The court, on the subject of the action of covenant, charged that the plaintiff having sued on the covenant, had elected his remedy, and could not resort to ejectment to enforce specific performance.

"But it is further urged on behalf of the defendant, that it would be against equity and good conscience to compel him to perform the contract specifically. He complains of undue influence and imposition practised on him, whereby he was drawn into an improvident and foolish bargain, unsuited to his age and circumstances; and we would remark here, that the plaintiff is not in a court of law seeking damages for the loss of his bargain, but he is in a court of equity, praying for a decree of specific performance; he must come, therefore, not only with clean hands and perfect propriety of conduct, but with such a contract as will in every respect commend itself to the conscience of a chancellor.

"It is shown here that John Brown, the scrivener, and chief witness of the plaintiff, stood in a very confidential relation to the defendant as his pastor and spiritual adviser. He was likewise the agent of both parties, receiving unequal compensation from them. His own interest lay in having the bargain between them concluded, and in preventing, if possible, its failure. He seems to have well understood this, and to have acted with reference to it throughout the transaction. At the earliest moment after consulting with his wife, the defendant repented of his bargain, and gave the plaintiff notice of her refusal and his inability to comply. Nothing had been done at that time to carry the contract into effect; the $20 earnest money was all that had been paid and received. It would have better comported with Mr. Brown's relations to old Mr. Neill and his family, if his connection with the business had ceased when he learned the dissatisfaction of the defendant and the distress of his wife. He says he did act fairly towards both parties, but we think that his course of conduct shows that his sympathies and efforts were enlisted and exerted unduly on the side of the plaintiff. We do not propose to enlarge upon

this by analyzing the testimony, nor shall we do more than simply refer to the plaintiff's delay in seeking to exact specific performance of the contract, which of itself presents a sufficient ground for the refusal of a court of equity to interpose for the relief of a tardy suitor. The enforcement of a contract in equity is not of right, but of grace, and a chancellor withholds the exercise of his extraordinary power whenever there is a doubt about the facts on the basis of which it is invoked. It requires less proof to induce a court of chancery to refuse its interposition on an application to enforce the specific performance of a contract, than it does·to cancel or annul an agreement. The interposition of the court is discretionary, governed, it is true, as far as may be, by general rules and principles, but looking to the circumstances of each particular case.

["Upon a careful consideration of all the facts, if the action of covenant was not in the way, we are not satisfied that we should impress our sanction on the verdict of a jury in favor of the plaintiff, thus giving to it the force and effect of a decree in equity. We therefore instruct you, that if you believe all the evidence on both sides to be true, the plaintiff is not entitled to recover."]

The verdict was for the defendant.

The plaintiff took a writ of error, and assigned for error:—

1st. The charge on the effect of the action of covenant.

2d. The portion of the charge in brackets.

*S. B. Wilson* (with whom was *H. Hice*), for plaintiff in error, cited on the second: Williams *v.* Bentley, 5 Casey 272; Henderson *v.* Hays, 2 Watts 148; Kuhn *v.* Nixon, 15 S. & R. 118; McDamel *v.* Marygold, 2 Clarke 500.

*N. P. Fetterman* (with whom were *S. Magaw* and *J. Whissel*), cited Mortlock *v.* Buller, 10 Ves. 293; Backus's Appeal, 8 P. F. Smith 195; Dougan *v.* Blocher, 12 Harris 28; Todd *v.* Campbell, 8 Casey 250; Henderson *v.* Hays, *supra.*

The opinion of the court was delivered, October 20th 1870 by

THOMPSON, C. J.—Two errors are assigned on this record. The first, and which relates to the effect of the action of covenant brought by the plaintiff in error, and the plaintiff below, against the defendant, in the action of ejectment subsequently brought by him, we need not discuss elaborately, as we are of opinion that whether right or wrong as to that, the learned judge was altogether right in his opinion that the facts disclosed, connected with the making of the contract, and what transpired in relation to it, did not present a case for specific execution. As a general rule, inconsistent remedies cannot exist at one and the same time, to redress a wrong, either in *tort* or on contract. But there are

[Piersol v. Neill.]

cases, and this is one of them, in which both or either, perhaps, might be employed, and we are, therefore, inclined to think the learned judge applied the principle too broadly; but as another ground, fatal to the plaintiff's right to recover, exists in the case, independently of the first, we will not reverse, for it would be a vain thing to send a case to be re-tried where it is apparent a recovery could not be had by the party claiming it.

On the 30th of March 1866, the plaintiff and defendant entered into articles of agreement for the sale, or, perhaps, rather for the exchange, of certain real property. The plaintiff's lay in New Sewickley township, Beaver county, and was held by him to be worth $10,000. The defendant's was situate in the borough of Freedom, in the same county, and was valued by him at $3500. Treating it as a sale and purchase in form, the defendant agreed to pay the plaintiff $10,000 for his property, viz. : twenty dollars in hand, to convey the Freedom property at the price or sum of $3500, and assign to him a judgment on the prothonotary's docket, of Beaver county, which he held against one Snead, for $2000, deliver possession of the Freedom property on the 2d of April, three days after the date of the agreement, and to give bond and mortgage at that time, to secure the cash payment of the remaining $5000 required to make up the purchase-money of $10,000, agreed to be paid the plaintiff for his land, in five equal annual instalments, with interest. This contract was written and signed at the plaintiff's residence, on the day the defendant was taken to look at the property by one Brown, who professed to act for him, and who claimed to be a licensed real estate broker, and who was, in fact, the defendant's clergyman.

We do not mean to give an analysis of the testimony in the case in this opinion, but we have carefully considered it, and with the learned judge below, who declared it insufficient in its character to entitle the plaintiff to a specific execution of the contract, we heartily concur. I briefly notice, however, that the undisputed testimony shows that, at the date of the making the contract, the defendant was an aged man, over 75 years. His family were all gone, excepting his wife, who was very infirm, over 72 years of age, and not present to advise and consult with him about the proposed sale and surrender of their home, as provided for in the contract. On the return home of the defendant, after entering into the contract referred to, his wife, on learning what had been done, was much dissatisfied and distressed, and declared over and over again, that she would not consent to the bargain; would never sign a deed to convey away her home, and move to a distance in the country, amongst entire strangers, and that she meant to live and die in the borough of Freedom. Under these circumstances, and dissatisfied himself with what had taken place, the defendant, early the next day, before anything had been done

under the contract, excepting the payment of the hand-money ($20) by him to the plaintiff, notified the latter of his inability, unwillingness and resolution not to comply with the contract, and demanded the return of the hand-money.  This the plaintiff refused, and made preparations to remove from his property, in execution of the contract, and did remove therefrom, pursuant to the agreement, and, I believe, within the time stipulated for the exchange of possessions, and afterwards, on the 16th of April, tendered a deed to the defendant and demanded a conveyance from the defendant of his property, the delivery of possession, an assignment of the Snead judgment, and bonds and mortgage to secure the $5000, the residue of the purchase-money.  The defendant refused, and offered $100 to be rid of the contract, which the plaintiff refused; after declining this, and on the 2d of June the plaintiff brought an action of covenant on the contract, against the defendant.  The writ issued, but nothing more was done in the case, no *narr.* was filed, or other proceedings had until after the death of Mrs. Neill, in the winter of 1867, when, in March of that year, the plaintiff brought this action of ejectment against the defendant, pending the action of covenant, to enforce specifically the execution of the contract, by a recovery of the Freedom property.  This was of course an equitable ejectment, and as it asked specific execution of the contract, and as it was only through and by that contract the plaintiff had any right to expect a recovery, he put himself in the situation precisely, as to the principles which should govern in the contract, as if he were a complainant in a bill in equity, and was bound to present a case which, in all respects, would call on a chancellor to see executed.  He could only recover by presenting a case which, in " equity and good conscience" would entitle him to the intervention of a chancellor.  This is as truly the rule in an equitable ejectment as it is in a bill in chancery, as already said.  I need not quote the language of judges to prove this.  I will simply cite the cases which rule it, viz. : Peebles *v.* Reading, 8 S. & R. 484 ; Tyson *v.* Passmore, 2 Barr 122 ; Brawdy *v.* Brawdy, 7 Barr 158 ; Greenlee *v.* Greenlee, 10 Harris 225 ; Dougan *v.* Blocher, 12 Harris 28.  There are numerous other cases iterating the same doctrine.

If it be asked how the doctrine of courts of equity is to be administered in this form of action, the cases cited above show that it is to be done by a proper observance of the distinct duties of the judge and the jury.  If in the opinion of the former, the facts are not such as should move a chancellor to decree specific execution of the contract, he should give a binding instruction to that effect to the jury, and withdraw the case from them ; if the case should be sufficient on the testimony, then the jury should be so instructed, and the testimony referred to them to find whether it be

[Piersol *v.* Neill.]

true or not.   The jury is not charged with administering the equities of the case further than to find the facts upon which they arise.   This is clearly the doctrine asserted in Dougon *v.* Blocher, *supra.*   Every element which would induce a chancellor to withhold his hand, in a court of chancery, will control and move a judge in administering the equities between the parties in an equitable ejectment.   Considering the circumstances surrounding the making of the contract in this case—the age of the defendant, the agency at work in pressing him into a reluctant bargain, namely, his accepted spiritual guide and professed friend, who, while seemingly acting for him, was in the employ of the other party, and entitled, if successful, to large commissions from him, the fact of writings being hastily drawn up on the spot, in the absence of his wife, or any other person to advise with who might be impartial; the nature of the agreement, viz.: to surrender his home within three days, and move with his aged wife to a distant farm in the country, which he could neither work himself nor supervise others while working it for him—his undertaking to pay a large sum of money by instalments, reaching to a period beyond any reasonable probability of the duration of his own life, and the doubts which, under the testimony, would be apt to strike the mind as to the conscionableness of the contract in all its aspects, were such circumstances, we think, that no chancellor could for a moment hesitate to refuse his aid in executing it.   The plaintiff was not imposed upon in regard to the action intended by the defendant, for he was, within a day after the contract, and before he had incurred the least expense or trouble on the foot of it, notified that its execution would be resisted.   He had not a shadow of equity, therefore, on that ground.   Nor was his delay in endeavoring to enforce specific execution, very persuasive that even he thought he could succeed in it.   These and many other considerations legitimately arising out of the testimony, satisfy us that the plaintiff was not entitled to demand the specific execution of his contract with the defendant, and that the opinion of the learned judge to that effect was altogether correct.   As already said, even if the learned judge had been in error in the view he took of the pending action of covenant, still he could not have, without error, made any disposition of the facts which would have entitled the plaintiff to recover, and therefore the judgment must be affirmed. For any damage the plaintiff has suffered, he must proceed on his covenants for redress.

Judgment affirmed.