# DAVID M. RENO v. CHARLES H. MOSS.

ERROR TO THE COURT OF COMMON PLEAS OF BERKS COUNTY.

Argued February 28, 1888—Decided April 23, 1888.

1. When, in an ejectment, the plaintiff rests his title upon an alleged parol contract of sale of the property in dispute, he is seeking in effect a decree of specific execution and the burden is upon him to show, (*a*) a contract complete in its terms and, (*b*) such partial performance, including a taking of possession in pursuance of the contract, as would make it unjust and inequitable not to execute it.

2. These requirements must be shown by evidence that is clear, unequivocal and convincing, such as to satisfy fully the conscience of a chancellor; for, to be in doubt as to the existence or the sufficiency of the contract is to be resolved against its specific execution, and, the ejectment being but a substitute for a bill in equity, the trial judge should withdraw the evidence from the jury, if, sitting as a chancellor, he would regard it as insufficient for a decree.

3. The plaintiff in an ejectment, alleged a parol sale to Henry, his ancestor, by Miller, the defendant's grantor, and, with evidence of possession taken by Henry contradicted as to character of the payment by Henry of a note for $2,250 to Miller and of a purchase money mortgage made by Miller to his own grantor, offered as the only evidence of the contract and its terms a paper of the same date with said note, as follows: "Received of Joseph Henry $2,250 as payment in full for house No. 228 North Sixth street, [signed] DANIEL MILLER." This receipt being attacked by evidence preponderating largely against its genuineness and leaving its character involved in uncertainty: *Held,* that the evidence was insufficient to justify a verdict for the plaintiff and it was error to submit the question to the jury: See Hess v. Calender, post, 138.

VOL. CXX—4

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 313 January Term 1888, Sup. Ct.; court below, No. 18 September Term 1880, C. P.

On August 11, 1880, Charles H. Moss brought ejectment against David M. Reno, to recover possession of house and lot No. 228 North Sixth Street, Reading, 25 feet in front and 230 feet in depth.

At the trial on April 14, 1886, it appeared, generally, that on October 17, 1865, Daniel Miller bought of William H. Clymer a larger lot of which the lot in dispute formed a part. The deed was to be executed on November 1, 1865, but though dated of that date it was not delivered until April 1, 1866. A purchase money mortgage was executed and delivered by Miller to Clymer also dated November 1, 1865, for $5,000 payable April 1, 1867, which mortgage was limited in its terms to the part 25 feet in front with the dwelling on it, the premises in dispute.

It was claimed by the plaintiff: That on March 13, 1866, Daniel Miller sold the house and lot in dispute to Joseph Henry, by a parol sale, giving him a receipt in the following words:

$2,250.                    READING, PA., March 13, 1866.

Received of Joseph Henry $2,250.00 as payment in full for house No. 228 North Sixth street.          DANIEL MILLER.

and that immediately thereafter Henry went into possession; that on April 13, 1867, Henry paid off the mortgage to Clymer, which was marked satisfied upon the record and with the bond delivered to Henry, who made repairs, paid taxes, sold to an adjoining owner the right to use the northern wall of the building, and continued in possession till 1870, when he died, intestate, leaving a son Benneville and Mrs. Moss a married daughter.

It appeared further that in 1873, by an action of ejectment, begun in 1871, and followed after verdict and judgment by an habere facias, Miller recovered the property from Benneville Henry, then alone in possession. In this action the above mentioned receipt was not produced in evidence. Benneville

Henry died in 1875, without issue, and at that date Mrs. Moss had also died, leaving as her only issue, Charles H. Moss, the plaintiff, a minor when the foregoing ejectment was brought, and who brought this suit against David M. Reno, in possession under Daniel Miller.

In this case, the plaintiff relied chiefly upon the above receipt together with a note produced, of the same date, March 13, 1866, at 60 days, for $2,250, drawn to the order of Daniel Miller, and indorsed by Daniel Miller, which had gone into bank and was paid by Joseph Henry, and also upon the payment by Henry of the mortgage heretofore referred to. These payments were disputed by the defendant, and as explanatory of the note for $2,250, the defendant put in evidence, (1) note dated March 10, 1866, for $1,262.25, given by Daniel Miller to the order of Joseph Henry, at 60 days; (2) due bill dated March 10, 1866, given by Daniel Miller to Joseph Henry for $987.25, " being for balance due him for his note payable to me, dated March 13, 1866, for $2,250; (3) a receipt in these words.:

" Received of Daniel Miller his note at sixty days for $1,262.75, and his due bill for $987.25, in consideration for my note dated March 13, 1866, for $2,250. [Signed] Joseph Henry." The genuineness of this last receipt was disputed.

The other material facts sufficiently appear in the charge to the jury and in the opinion of this court.

The court, HAGENMAN, P. J., after a recital of the preliminary facts, charged the jury as follows :

As there was no deed from Miller to Henry, the plaintiff, Charles Henry Moss, alleges that there was a parol sale, and has submitted certain evidence which he claims establishes a parol sale of this house and lot from Miller to Henry. Now, what are the facts as they have been presented, and which are claimed by the plaintiff make out that sale ?

It is claimed on the part of the plaintiff, and it does not seem to be denied by the evidence anywhere, that Joseph Henry, during the latter part or some time in March, and up towards April, 1866, made improvements to that property. Some one or two of the witnesses stated that the property was vacant for some time, and that Joseph Henry made some im-

Charge of Court below.

provements, painting, etc., and fixing up the yard, front and back railing, pavement; and went into possession about, a little before or a little after, the first of April, 1866. It is claimed by the plaintiff that Henry went into that possession under a parol sale made to him; and as evidence of that fact there is submitted to the jury, first, a note dated March 13, 1866, for $2,250, drawn to the order of Daniel Miller, indorsed by Daniel Miller. This note went into bank, and was finally paid by Joseph Henry. The note is found among the papers of Joseph Henry after his death, which indicates that that note was paid by him. There is a receipt given in evidence for the same sum, dated March 13, 1866, which reads as follows: "Received of Joseph Henry twenty-two hundred and fifty dollars, as payment in full for house No. 228 North Sixth street," bearing a signature purporting to be that of Daniel Miller. It is claimed upon the part of the plaintiff that this receipt shows the payment by Joseph Henry to Mr. Miller of twenty-two hundred and fifty dollars, and it is claimed that this note, when paid, was the amount stated and mentioned in this receipt. You have heard a great deal of contention about this receipt, and I will have something to say about it presently.

Joseph Henry went into possession of that property in the spring of 1866, and during the time that he was in possession he made other improvements. Mr. Bricker says he did papering, and painting outside and inside, and began in May, 1870, and ended in September, 1870, the bill for which was not paid by Joseph Henry in his lifetime, but was paid by his administrator after his death.

There was a mortgage given, dated also November 1, 1865, by Daniel Miller to William H. Clymer, upon the house and lot in dispute, designating twenty-five feet front by two hundred and thirty feet in depth. According to the receipt on the back of the bond, this mortgage was paid on April 13, 1867. The mortgage was for $5,000, payable April 1, 1867; but by the receipt it seems it was not paid until April 13th, a few days after the first. The mortgage was paid by Joseph Henry. The receipt on the back of the bond is in these words: "Received April 13, 1867, of Joseph Henry $5,425, being the principal and interest on the within bond." The $425 was the interest on this bond. . . . . .

There is also a check given in evidence, drawn by Joseph Henry to the order of Clymer on the Farmers Bank of Reading, and that check is found among the papers of Joseph Henry, indicating that it had passed through bank, and that this mortgage with its interest was paid by Joseph Henry.

Other evidence is submitted on the part of the plaintiff which was designed or intended to show the contract of sale of this property. Judge Stitzel was called as a witness, and he spoke about the improvements that were made on this property, and that they were made under the direction of Joseph Henry. Edward M. Gilbert was called as a witness also, who, in the construction of a building to the north of this, and in the use of that northern wall, stated that he had paid Joseph Henry for it, and that during Henry's lifetime Miller had made no claim against him for the use of that wall, and that no claim was made by Miller until after Henry's death. That is a circumstance given in evidence by the plaintiff for the purpose of showing that Henry was the owner of that property. Mr. Wootten was examined, who seems to own the property immediately south of these premises, and stated that the division fence was made between himself and Henry, and that Henry had paid his portion, had supplied the posts and paid his portion of the expense of making that fence. Albert Smith was examined as a witness, who states that he and Miller were in partnership together, and that some time during 1866, or the beginning of 1867, they had some conversation in regard to the purchase of property and the sale of property, and that Miller told Smith that he had sold that house and lot to Henry, and that the price was named, which the witness could not then recall, but he was left under the impression that Henry had paid Miller the amount of the consideration. Mr. Laucks was also called as a witness, who speaks of having been tax collector in 1869 and I think 1870 and 1871—along there, at all events—and when he called upon Miller for the tax Miller sent him to Henry, and that Henry paid the tax. In April, 1866, after the execution of the deed and mortgage, Mr. Miller, according to the testimony of Jefferson M. Keller, came to the recorder's office with Mr. Henry, and brought the deed and mortgage there together to be recorded, and that Mr. Henry paid the record-

ing fees.  It is also claimed by the plaintiff that during the time that Henry occupied these premises, from the spring of 1866 until his death in September, 1870, he paid no rent to Miller; and this is urged upon the part of the plaintiff as a circumstance to be taken into account by the jury in finding whether there was a parol sale of this property to Henry.

You take these facts all together, and then the question arises, does that constitute a parol sale of this property to Mr. Henry?   There was a good deal said about the statute of frauds in the early part of this case, which provides that all conveyances of property must be in writing.   The act of assembly of March 20, 1872, 1 Sm. L. 389, reads: . . . . .

It would seem from this that all title to land, certainly as claimed here, should be in writing.   But the Supreme Court has given a construction to this act of assembly, and in a case which I have before me, that of Jamison v. Dimock, 95 Pa. 52, the judge delivering the opinion says: " It is too well settled to be now disputed that where money has been paid, and possession given, in pursuance of a parol contract for the sale of land, equity will enforce specific execution of the contract, on the ground that to suffer a man who has received the money to take both money and the land by pleading the statute of frauds would make the statute itself an instrument of fraud, which it was made to prevent."   In another case, that of Hart v. Carroll, 85 Pa. 510, the judge delivering the opinion, says: " Where a parol contract of sale is precise as to the terms and subject-matter, and the vendee has taken possession in pursuance of it, and made valuable improvements, with the assent of the vendor, it is not within the statute of frauds."

[Now, gentlemen, you will take all the facts which have been submitted by the plaintiff; first, the possession of Henry, the making of valuable improvements, and the payment of the consideration money, first, it is said by note March 13, 1866, and the receipt stating it as payment in full for house No. 228 North Sixth street; and in connection with that you will take the mortgage, which was given upon these premises alone, and paid by Henry on April 13, 1867 ; you further take into account the evidence of Mr. Gilbert, who built upon the northern wall ; you take into account the payment by Henry of the division fence, and the circumstance of Miller and Henry

going to the recorder's office with the deed and mortgage, and Henry paying for the recording of them; the fact of Henry's paying no rent; and the further fact, testified to by Mr. Smith, that Miller stated to him that he had sold this property to Joseph Henry, giving him to understand as though the consideration money had been paid, though the price he was not able to name; and if, from these facts, the jury find that there was a parol sale of this house and lot to Joseph Henry, the statute of frauds does not stand in the way of the plaintiff's right to recover.]  [2]

The defendant submitted testimony from which he asks the jury to infer, or to say, or to find, that there was no sale of this property to Joseph Henry. The first witness called for that purpose is Mrs. Vaughn, who says that in 1867 she looked over this house with a view to purchase. The next witness that is called is Charles Miller, who states that Henry came to Mr. Miller's bone mill some time in the winter of 1866, and said to Miller, " I would pay you some rent, but I am hard up ; " and, further, that a year or more after this Henry said, " You must not rent that house, because the women folks are kicking up the devil." " Mr. Miller said, ' I have an offer for the house ;' and then Henry said, ' I can give as much as anybody ;' Mr. Miller said, ' Then, you can have it.' " This is offered for the purpose of showing that there was no sale of this property to Henry in the spring of 1866.

The plaintiff, in answer to this statement in regard to rent, has called Mr. Smith, who was a partner of Mr. Miller from 1865, if I am correct, to 1870 ; and he states that in 1870 he informed Mr. Miller that they would have to have some money; and as Miller was the partner who was to furnish money, he said it should be forthcoming; and immediately, or soon thereafter, Mr. Henry came to the place and asked the amount of money which was required, and was told $2,700, and Henry left some money, and went out and came in again and left other moneys there until the $2,700 was raised by Henry. That money was not repaid to Henry altogether until about the dissolution of the firm in 1870. The allegation of the plaintiff is that Henry was furnishing money to Miller at this time ; and that therefore this story about him having no money to pay the rent is not to be believed. These are facts for the jury.

Charge of Court below.

The next witness called was Charles Deem, who says that Henry came to Miller's shop in 1868, 1869, or 1870, and had a paper or note which he wanted Miller to sign; and said that when he got the money he would pay him rent, and make arrangements to buy the property. This is offered also for the same purpose, to show that there was no parol agreement for the sale of this property, and that Miller did not sell it to Henry.

Then Thomas Bechtel is called, who speaks about having moved a frame office on North Sixth street, and ran into a tree in front of where this property is, and cut off a limb; and that after that Henry had some conversation about it, and speaking about the cutting of the limb, Henry said the property belonged to Miller, and further that he, Henry, did not own any house in Reading. This evidence is offered for the purpose of showing that there was no sale of this property.

Defendant's counsel has called my attention to the matter of assessments. That property was assessed in the name of Miller; and it is right that I should say that up to 1869 or 1870 it was assessed in his name; and that at that period Henry directed or told the assessor to assess the property in his (Henry's) name.

Next is the receipt. The plaintiff called some four or five witnesses, I do not exactly remember, and they gave their testimony in regard to the genuineness of the signature of Daniel Miller to this receipt. The defendant denies the genuineness of the signature, and says that it is a forgery. And this case will turn upon that question, whether the signature is genuine or not.

[The court here reviewed the testimony of fifteen or more witnesses called by the defendant to show that the signature to the receipt was not the signature of Daniel Miller, and proceeded :]

From all this testimony, the jury will have to ascertain whether this signature is genuine or not. The plaintiff claims that it is, and that the circumstances which he has shown in regard to the sale of this property are corroborative of that fact.

At this place I will answer two of the points which have been submitted to the court by defendant's counsel.

4. If the jury find that the receipt of March 13, 1866, for

twenty-two hundred and fifty dollars, purporting to be signed by Daniel Miller, and offered in evidence by the plaintiff, was not signed by Daniel Miller, then all the other evidence offered by the plaintiff is incompetent and insufficient, and must be disregarded by the jury.

Answer: This point is affirmed.

5. If the jury believe that the said receipt of March 13, 1866, for twenty-two hundred and fifty dollars, purporting to have been signed by Daniel Miller, was not signed by Daniel Miller, it is the end of the plaintiff's case; and the verdict must be for the defendant.

Answer: This point is affirmed.

I may as well also answer the sixth point in this connection.

6. Even if said receipt of March 13, 1866, be genuine, it is not sufficient to establish title under the statute of frauds.

Answer: We decline to charge you as requested in this point. We have already explained to you and said that if you find from all the evidence which has been submitted by the plaintiff, the receipt being genuine, that it is sufficient to show a parol sale of this house and this lot to Joseph Henry, the statute of frauds will not stand in the way.[1]

The third point has been withdrawn, and I will proceed to answer the remaining two points at this time : . . . . .

2. This action of ejectment having been brought to recover a certain house and lot of ground, situate on the west side of North Sixth street, No 228, in the city of Reading, on an alleged parol sale of the premises to Joseph Henry in 1866 by Daniel Miller, the present defendant, under which the said Joseph Henry went into possession, paid the purchase money, and made improvements ; and the defendant having shown that Daniel Miller as grantor recovered against said equitable title in a former action of ejectment by said Miller against Mary Henry, the widow, and Benneville M. Henry, the heir-at-law of Joseph Henry, the persons in possession, to No. 2 June Term, 1871, in which a verdict and judgment were rendered in his favor, and possession obtained by writ of habere facias, said verdict and judgment are conclusive of the defendant's title and a bar to the present suit.

Answer : If the jury find that the defence in the previous ejectment, No. 2 June Term, 1871, was based upon the verbal

Charge of Court below.

contract which the plaintiff sets up in this case, then the verdict and judgment in that case are conclusive upon the plaintiff and a bar to his recovery in so far as the plaintiff claims as heir of Benneville M. Henry ; but as to the interest which he claims as heir to his mother, Mrs. Moss, the said verdict and judgment in no wise affect him, and are not in the way of his recovery in this action.[4]

[Now, gentlemen, I have explained to you the views which I have in regard to the law of this case. And I say to you again that if you find from all the evidence submitted to you upon the part of the plaintiff, and find the receipt genuine, that there was a parol sale from Miller to Henry, the jury will be justified in finding a verdict for the plaintiff for one undivided half of the premises in dispute—not the whole as mentioned in the writ, but for the undivided one half of the premises in dispute.] [3]

Benneville M. Henry, who was joint owner with Mrs. Moss, his sister, on the death of their father was cast in the former action, and the interest which he had, passed to Mr. Miller in that action, and is a bar to the plaintiff's right to recover, although he is heir of Benneville M. Henry. But Charles Henry Moss was a minor at the time when this action was brought, and neither his mother nor himself were put on the record, and his rights were not determined in that action.

On the other hand, if the jury find from all the evidence submitted on the part of the plaintiff that there was no sale of this property, and that the receipt is a forgery, the verdict will be in favor of the defendant.

Mr. GREEN: I call the attention of the court to the explanation of the $2,250 note. Your honor has not said anything about it.

By the court: We are asked to say something as matter of explanation of that $2,250. There was given in evidence by defendant a note dated March 10, 1866, from Daniel Miller to Joseph Henry, for $1,262.75, which passed through bank, and was evidently paid; and also a due bill of the same date, in these words : " Due Joseph Henry on demand, $987.25, being for balance due him for his note made payable to me, dated March 13, 1866, for $2,250. [Signed] DANIEL MILLER."

They also offered a receipt which is alleged by defendant to

be the receipt of Joseph Henry, and which is denied by plaintiff, who says the signature is not genuine. These will also be taken into consideration by the jury.

The verdict of the jury was in favor of the plaintiff for the undivided one half of the property in dispute. On January 22, 1887, a rule for a new trial was discharged, as per opinion filed, and judgment entered on the verdict. Thereupon, the defendant took this writ, assigning as error, inter alia:

1. The answer to defendant's sixth point.[1]

2, 3. The parts of the charge embraced in [ ][2][3]

4. The answer to defendant's second point.[4]

13. The charge of the court as a whole, tended to mislead the jury and prejudice the defendant's case. Instead of determining as a chancellor whether the evidence was sufficient to support the plaintiff's claim for specific execution of the verbal contract, and then submitting to the jury to say whether the testimony was true or not, the court magnified the importance of loose and unreliable and immaterial testimony, and so blended it with the question of the genuineness of the receipt as to confuse the jury in the determination of its validity.

*Mr. A. G. Green* and *Mr. George F. Baer*, for the plaintiff in error:

1. The evidence in this case did not bring it within the statute of frauds. In order to take a parol contract for the sale of lands out of the operation of the statute its terms must be shown by full, complete, satisfactory and indubitable proof, defining the boundaries ; indicating the quantity of the land ; fixing the amount of the consideration ; establishing the fact that possession was taken in pursuance of the contract and at or immediately after the time it was made, and the fact that the change of possession was notorious, exclusive, continuous and maintained, and showing performance, or part performance by the vendee which could not be compensated in damages and such as would make rescission inequitable and unjust: Hart v. Carroll, 85 Pa. 510 ; Bowers v. Bowers, 95 Pa. 480 ; Lord's App., 105 Pa. 451.

2. What was the consideration to be paid by Henry? The receipt says the $2,250 was received as payment in full, but it

was not pretended that this was the whole consideration. Inference will not do; there must be indubitable proof: Greenlee v. Greenlee, 22 Pa. 236; Ross v. Baker, 72 Pa. 189. What was the thing sold? At the time of this receipt Miller had purchased the house and lot 84 feet in front, by 230 feet in width. It was one property. How much was included in the simple description, "house No. 228"? No witness knows: no writing explains: Soles v. Hickman, 20 Pa. 183.

3. A written receipt, signed by the vendor alone, which does not clearly show the nature of the contract and define its terms, is not sufficient to be relied upon. It must so far describe the property and set forth the price and terms of payment, as to enable a chancellor to make a decree from the face of the writing alone without the aid of parol evidence, otherwise all the mischiefs intended to be guarded against by the statute will be introduced: Eargood's Estate, 1 Pears. 400; Williams v. Morris, 95 U. S. 445; Phelps v. Stillings, 60 N. H. 505; Fry v. Platt, 32 Kan. 62; Grace v. Dawson, 114 Mass. 16; Welsh v. Bayard, 21 N. J. (E) 187; Wright v. Mischco, 52 N. Y. (S. C.) 241.

4. There was no satisfactory evidence that possession was taken under the pretended contract. The plaintiff simply proved that Henry went into possession in April, 1866. But it was also in evidence that the property was afterwards assessed in Miller's name, that Miller offered it for sale and Henry had knowledge of it. Besides, when the facts and the terms of the parol contract are not established, possession cannot be used to supply defects in the evidence of the contract; it only becomes material when the parol contract is proved. And it is absurd to speak of ordinary repairs, such as were testified to have been made by Henry, as coming within the rule as to valuable improvements. They never equaled the rent of the premises, and were capable of compensation in damages.

*Mr. Cyrus G. Derr* (with him *Mr. D. E. Schroeder*), for the defendant in error:

1. The plaintiff based his case upon the receipt of March 13, 1866, and as it affirms that the $2,250 was payment in full, he was not only pretending but declaring, throughout the trial,

that sum to have been the purchase-money. With the exist-
ence of Miller's purchase-money mortgage for $5,000, of even
date with his deed, a more specific designation of the amount
of purchase-money was unnecessary.

2. The receipt was dated at Reading and described the pro-
perty as "house No. 228 North Sixth street." House, is synon-
ymous with messuage and conveys all that comes within
the curtilage : Rogers v. Smith, 4 Pa. 101. Moreover, the
description in the mortgage, limiting its effect to the house
and 25 feet of ground, conclusively indicates a separation of
the lot from the larger one purchased from Clymer ; and
Henry's payment of the mortgage, limited to the 25 feet lot,
and the putting up a line fence inclosing the same would
effectually remove all doubt.

3. Though the evidence (reviewed) clearly established that
possession was taken in pursuance of the contract and valu-
able improvements made, yet, under the decisions of this
court, the receipt itself is sufficient to take the case out of the
operation of the statute. The essential elements in which the
receipts were held insufficient in Williams v. Morris, 95 U. S.
445 ; Fry v. Platt, 32 Kan. 62 ; Grace v. Dawson, 114 Mass.
16, this receipt possesses. On the other hand, when the
receipt is compared with those in Ross v. Baker, 72 Pa. 188 ;
Evans v. Prothero, 13 Eng. L. & E. 163, it has every ingre-
dient necessary ; it contains the names of the buyer and seller,
a sufficient description of the property sold, and the amount
of the purchase-money.

OPINION, MR. JUSTICE WILLIAMS :

This is an equitable ejectment in which the plaintiff's title
rests upon an alleged parol contract for the purchase of a
house and lot in the city of Reading. The important ques-
tion raised by the assignments of error is, whether the proof
of the contract and of the part performance of its terms, is
sufficient to take the case out from under the operation of the
statute of frauds. The plaintiff is in effect seeking a decree
of specific execution, and the burden is on him to show, first,
a contract complete in its terms ; and next, such partial per-
formance by the parties including a taking of possession in
pursuance of the contract as to make it unjust and inequit-

able to rescind it. This must be shown by evidence that is clear, unequivocal, and convincing, so as to satisfy fully the conscience of a chancellor; for, to be in doubt about the existence or the sufficiency of the contract is to be resolved against its execution. These general principles are well settled and have been often asserted by this court. Some of the many cases in which they are stated and discussed are McKowen v. McDonald, 43 Pa. 441; Hart v. Carroll, 85 Pa. 510; Bowers v. Bowers, 95 Pa. 477; Lord's Appeal, 105 Pa. 451.

The trouble in this class of cases is not in ascertaining the rules of law that are applicable, but in making an application of them to particular cases. In the case at bar, both parties claim under Daniel Miller now deceased. Moss alleges that his grandfather Joseph Henry, bought the house and lot in the spring of 1866, by verbal agreement under which he took possession and paid the purchase-money. He then shows the death of Joseph Henry in 1870, leaving a son and daughter; the death of the son intestate and without issue, and the death of the daughter of whom he is the only child. He is therefore the only living descendant of Joseph Henry, and claims title as heir-at-law. The defendant denies the existence of the alleged contract, and shows a deed duly recorded made to him by Daniel Miller, for the house and lot.

In support of the alleged parol contract the plaintiff's evidence, aside from the receipt of March 13, 1866, to which we will presently refer, consists of a note of March 13, 1866, for $2,250.00 found among the papers of Joseph Henry after his death, of a mortgage for $5,000, given by Miller to Clymer covering the property in controversy, together with proof that the money to satisfy it was paid by Henry, and of declarations of Miller and acts and declarations of Henry, including the fact that he went into possession of the house in the spring of 1866, and remained in possession till his death, and made some repairs thereon. There was, however, no evidence showing the terms of any contract of sale; and the character of Henry's possession, whether as tenant under Miller, or as a purchaser, was a question about which there was much conflicting testimony. Both the alleged payments were in like manner denied and the money with which the Clymer mortgage was paid, was asserted to have been furnished by Miller.

It also appeared that in 1871 Miller brought an action of ejectment against the widow and son of Henry, who were then in possession of the house and who declined to pay rent. That case came on for trial in 1873, and the defendants put in evidence substantially the same facts and circumstances in support of the same alleged parol contract by way of defence to the action of Miller, as we have seen, were put in evidence by the plaintiff in this action in support of his title. The learned judge of the Common Pleas, the late WARREN J. WOODWARD, afterwards a member of this court, held that the evidence was insufficient to establish the parol contract set up, and directed a verdict in favor of Miller. Upon this verdict judgment was entered, a writ of habere facias issued, and Miller put in possession by the sheriff. This action was brought by Moss in 1880. The evidence upon the trial differed from that before the court in 1873, chiefly in the fact that the plaintiff produced and put in evidence the receipt of March 13, 1866. It is as follows:—

"$2,250.                    READING, Pa., March 13, 1866.

Received of Joseph Henry $2,250 as payment in full for house No. 228 North Sixth street.

DANIEL MILLER."

This receipt bears the same date with the note found among the papers of Henry after his death, and is for the same amount; and the theory set up by the plaintiff is, that the note was accepted as cash by Miller in settlement for the balance due upon the purchase-money, that the receipt was given to show that the transaction was closed, and that it affords a sufficient memorandum in writing of the terms of the contract and the payment of the purchase-money to take it out from under the operation of the statute of frauds.

Without this receipt there was no sort of proof of the contract. It was not produced on the trial of the action of ejectment in which the widow and son of Henry were defendants in 1873, and its genuineness is very earnestly attacked. It is important, therefore, to examine the testimony relating to it in order to determine to what extent a chancellor should be moved by it. Moss, the plaintiff, testifies that he found it in an old trunk belonging to his grandmother, Mrs. Henry, at the

Widow's Home in Reading a few weeks before she died in 1883 or 1884. He describes the circumstances thus : "I did not look after the paper until she called my attention that there was some papers, and was silk dresses of my mother's and the family, and small scraps and papers, and old books, German books and the like that were in there. She said she thought she was getting old and feeble and that I had better look through, and as I looked through I found these papers." He further says that the old trunk was very nearly full of scraps of silks and cambrics and linens and old books, and that they were all lying loose in the trunk.

The paper is dated March 13, 1866, and this discovery was made by Moss, as he says in 1883 or 1884, some eighteen years afterwards. It was found in the trunk of the widow of Henry who had a verdict rendered against her and her son in 1873, for want of just such proof of the terms of the contract. Four witnesses testified to their belief that the signature of Miller to the receipt was in his own handwriting, and it was admitted in evidence. The defendant called a large number of witnesses who testified that the signature was not Miller's, and several experts, who expressed the opinion that the paper at the time of trial was not more than five or ten years old, that it was written in ink not in use at the date of the paper, and that the appearance of age in the color of the paper was due to the use of chemicals. In addition to this direct attack upon the receipt, the defendant produced and gave in evidence for the purpose of contradicting the statement contained in it the following papers, viz.: An unsigned memorandum in the handwriting of Daniel Miller containing this statement:—

"Note, March 10, 1866, Miller to Henry, . $1,262.75
Due bill, March 10 1866, Miller to Henry, 987.25

$2,250.00 "

Also the note and due bill referred to in the memorandum signed by Miller, and a receipt purporting to be signed by Joseph Henry, in the following form:—

"Received of Daniel Miller, his note, at 60 days, for $1,262.75, and his due bill, for $987.25, in consideration for my note, dated March 13, 1866, for $2,250.00. JOSEPH HENRY."

These papers taken together made a most effectual answer to the receipt found in the old trunk. If they were genuine, the plaintiff's receipt could not be; and, on the other hand, if the receipt was an honest paper, the entire set of papers produced by the defendant were forgeries.

Our question now is, whether this receipt which was attacked at every point, furnishes the clear, unequivocal, and convincing proof of the existence and terms of the parol contract, on which the plaintiff's title depends, that should move the conscience of a chancellor and induce a decree for specific performance. Without the receipt the plaintiff is without a case. With it, if its genuineness was satisfactorily established, he might be entitled to relief. But the balance of the evidence is against its genuineness, largely, if not overwhelmingly so. The very least that can be said is, that the character of the receipt is involved in painful uncertainty. Instead of the feeling of confident belief which is necessary to move a chancellor, the evidence leaves room only for perplexing doubt or positive distrust. For this reason alone, specific execution ought not to be decreed. In addition to this, the verdict against this contract, rendered in 1873, was conclusive as to the one half of the title of Joseph Henry, which descended to his son Benneville. That verdict may not be conclusive upon the title of Mrs. Moss, the other child of Joseph Henry, who was not a party to that action, but upon substantially the same facts, it is strongly persuasive. But it is unnecessary to lay stress upon the persuasive value of that verdict, for there was no such proof of the existence and terms of the contract as to move a chancellor to decree specific performance. This action being a substitute for a bill in equity, it is the duty of a judge to withdraw the evidence from the jury, if sitting as a chancellor he would regard it as insufficient to justify a decree. The second, third, and thirteenth assignments of error are sustained.

Here we might with propriety dismiss this case, but for the circumstance that the learned judge of the court below seems to have treated this action as indistinguishable from the ordinary action at law, in the relative functions and powers of the judge and the jury, and to have regarded the verdict as conclusive of the question submitted to the jury. But in Penn-

sylvania, an action of ejectment on an equitable title to land
is in effect a bill for specific performance, and therefore gov-
erned by the general principles of equity: Deitzler v. Mishler,
et al., 37 Pa. 83 ; Remington v. Irwin, 14 Pa. 143. A decree
of specific execution will therefore depend on the justice and
equity of the case presented: Remington v. Irwin, supra; and
a recovery will not be permitted, unless "equity and good
conscience entitle a party to the intervention of a chancellor."
This doctrine is clearly stated by THOMPSON, C. J., in Piersol
v. Neill, 63 Pa. 420, who states that it is "as truly the rule in
an equitable ejectment as it is in a bill in chancery." To the
same effect are Peebles v. Reading, 8 S. & R. 484; Tyson v.
Passmore, 2 Pa. 122; Greenlee v. Greenlee, 22 Pa. 225.

In a proceeding by bill, if a chancellor sends an issue to a
jury, he is not bound by the verdict. It is in ease of his con-
science merely, and if the verdict does not satisfy his con-
science he may set it aside as often as he pleases or make his
decree in utter disregard of it: Brightly's Eq. Jurisp., §§ 758,
759. That substantially the same rule prevails in equitable
ejectment was very distinctly stated by GIBSON, C. J., in
Brawdy v. Brawdy, 7 Pa. 157. "In ejectment," said the
Chief Justice, "as upon a bill in equity, whatever would affect
the conscience of a chancellor is to be taken into considera-
tion." Again, when speaking of the duty of the chancellor
and his complete independence of the action of a jury, he
says: "But even when a chancellor sends such an issue to a
jury, it is only as an advisory council and in ease of his con-
science ; for he may direct any number of new trials or decide
at once in opposition to the verdict." The doctrine that the
enforcement of a contract by a decree for specific performance
is of grace and not of right is applicable to equitable ejectment
as truly as to a proceeding by a bill. This was so held in
Piersol v. Neill, supra. THOMPSON, C. J., who delivered the
opinion in that case uses this language : " Every element that
would induce a chancellor to withhold his hand in a court of
chancery, will control and move a judge in administering the
equities between the parties in an equitable ejectment."
Dougan v. Blocher, 24 Pa. 28, was an equitable ejectment.
In reversing the judgment of the court below entered upon a
verdict this court said : " The error of the court below consisted

in committing such a case to the speculations of the jury;"
and in discussing the duty of a judge in this form of action
the court further said, "A chancellor calls a jury to his aid
only when the material facts are in doubt and conflict, and
then only to inform his conscience." In Church v. Ruland,
64 Pa. 432, the action was ejectment upon an equitable title,
and the distinction to be taken between that form of action
and an ordinary action at law is very plainly brought out by
SHARSWOOD, J., in the opinion of the court. He says: "The
judge in reality is the chancellor with the assistance of a jury.
It is not like other ordinary trials at law, where any evidence
reasonably tending to prove a fact must be submitted to be
passed upon by that tribunal. The conscience of the judge as a
chancellor must be satisfied, and what goes to the jury is to
determine the credibility of witnesses and to weigh or decide
upon conflicting evidence. What is this but the trial of a
feigned issue out of chancery? If the evidence is too vague,
uncertain, or doubtful to establish the equity set up, even if
believed it is the duty of the judge to withdraw it from the
jury." Equally clear is the language of WOODWARD, J., in
Moore v. Small, 19 Pa. 461, which was an action of ejectment
in which an alleged parol contract passed under judicial scru-
tiny. In discussing the duties of a judge and the manner in
which they are sometimes abandoned by a submission of the
whole case to a jury he says: "The judge blots himself out
and surrenders his functions to the jury, who, more affected
by the supposed hardship of the case than by the policy of the
statute, blot out in their turn that venerable and valuable rule
of property. But how is this to be prevented? In no other-
wise than by the action of the judge as a chancellor which he
really is."

From this review of the cases it is quite clear that in an
equitable ejectment the judge sits as a chancellor; that it is
his duty to "view and weigh facts for himself," and to with-
draw the evidence from the jury when it is not such as ought
in equity and good conscience to induce a decree of specific
execution. Whether the doubt arises from the insufficiency of
the facts alleged if found by the jury, or the insufficiency of
the evidence to justify a finding in favor of the alleged con-
tract, is of no consequence. It is the existence of the doubt,

however arising, that stays the hand of the chancellor. Unless upon the whole evidence the conscience is moved, the decree should be withheld. That this should be so, seems as evident upon principle as it is upon authority. The plaintiff and all persons similarly situated have an election between two remedies. They may seek the specific execution of the contract which they set up, by bill or by an action of ejectment. Either remedy brings them before the same judge, upon the same contract, and with the same evidence. It would be an inconsistency, not to be tolerated, if the conscience of the chancellor could be bound by the verdict of a jury in an action of ejectment, rendered upon evidence which, if presented to him in a proceeding by bill, he would turn away from as too uncertain, too much in doubt, to use no stronger terms, to justify a decree.

A verdict in an equitable ejectment has no such power. The conscience of the chancellor must be satisfied by the evidence, and if it is not so satisfied, a verdict if rendered cannot bind him. He may set it aside as often as his sense of justice may require it. If at the conclusion of the case the evidence taken as a whole is of such a character as to make a verdict a mere guess by the jury, he may, and should decline to submit it. If the fair balance of the evidence is against the contract set up, so that sitting as a chancellor he would refuse a decree, he should withdraw the case from the jury. His duty is to do that which in right and equity ought to be done. Every prayer for relief is an appeal to his conscience upon the equities, the intrinsic merits of the case presented. If the plaintiff's equities are not clear, if his hands are not clean, if the relief he asks is not conscionable under all the circumstances, he has no standing before a chancellor, no matter what may be the route by which the case reaches him. In an ordinary action at law the facts are for the jury. Where a verdict has been rendered, the question is not whether the judge would have found the facts in the same way from the same evidence, but whether there was evidence before the jury, which if credited by them would support their verdict. They are the judges of the credibility of the witnesses, and they may believe when a judge would reject the testimony of a witness. But in an issue out of chancery and in an equita-

ble ejectment the question is: Does the verdict seem to the chancellor to be a fair and conscionable conclusion from the testimony? Does it satisfy his conscience? If not, the responsibility is still on him notwithstanding the verdict.

In this case we have shown by a glance at the evidence that the plaintiff's contract passed under the examination of the Court of Common Pleas in 1873, and was properly rejected, there being no proof of its terms. The alleged receipt found ten years later, besides the remarkable story of its discovery, was discredited by the clear balance of the testimony on the question of its having been executed by Miller, by the testimony of the experts in regard to the ink with which it was written, and the use of chemicals to produce an appearance of age. The papers, having the same date, explanatory of the transaction to which the receipt relates, which were produced by the defendant, were absolutely overwhelming, unless shown to be fraudulent. Upon the whole case a chancellor could not hesitate for one moment as to his duty to refuse a decree. Why should he blot himself out, that the jury might in turn blot out the statute of frauds and perjuries when it was his duty to apply it?

The evidence did not justify the verdict, and it should not have been submitted to the jury.

Judgment reversed.